My first argued case this morning is Walsh World v. Belanger, et al., 2023-1841. Mr. Gannon. Good morning. May it please the Court. With respect to outer cushioning sleeve, the intrinsic record could not be more clear. The intrinsic record repeatedly and consistently refers to the cushioning sleeve. I'm concerned with whether you made the argument to the District Court. I didn't find anywhere where you even referenced resilient to the District Court as part of what you wanted your construction of outer cushioning to be. Can you point me to where in the record you did that? Sure. Appendix 2118, which was from our Markman brief. Is that where you cite to the patent specification? That's correct. You highlight soft and you don't highlight resilient and you don't ask for a construction that includes resilient. Shouldn't the District Court have understood you didn't care about resilient? I think it was clear from the Markman briefing that we were asking for an understanding of cushioning sleeve that is soft and resilient. The problem is on appeal, what you're advocating is a construction that says not just outer sleeve is soft and resilient, but i.e. it can be compressed and spring back into shape like a cushion. We did a search of yours. There's no mention of compression or springing back in any of the prior requests for claim construction. When the summary of the invention says that the spray arm has to be soft or resilient, the meaning of resilient, the ordinary meaning of resilient is something that's compressible, something that you can compress and that will spring back. But you never asked for a construction that said resilient or spring back. I think what you're referring to, Your Honor, is the actual words of the construction. I think the Ventura case is right on point on that particular issue, where the Ventura court looked to see what was the essence of what the parties were arguing. It wasn't looking at the precise wording of the construction. So in the Ventura case... The essence of what you were arguing for was thick sleeve of extruded foam plastic that acts as a protective cushion to prevent damage. I don't see how we could say that essence is spring and bounce back or even resilient. So just as in the Ventura case, Your Honor, in that case, there was a construction given by the court. And on appeal, the construction was, I believe, high milling, which was not in the stated construction. And the Federal Circuit found in the Ventura case, you know, the precise wording of the construction isn't what's relevant. What's relevant was the court and the parties on notice of the argument that was being made. And if you look at... Is there any point after claim construction that you contend you gave the district court notice that you thought there was still a dispute over the meaning of outer cushioning in that the jury needed to be told it had to be resilient and it had to be able to spring back after being compressed? Right. So in the Markman, I just referenced Appendix 2117 to 2118. That's the Markman briefing where it was very clear we were telling the court that there's a dispute about cushion. We cited to the Eon case saying if there's no construction, there's going to be a problem because we believe that cushioning sleeve is what the specification repeatedly shows, is something that's soft and resilient. And then the court said, no, I'm not going to construe the claim. On summary judgment, we said in Appendix 2911, quote, the hard plastic cover, which is the blue cover of the spray arm, which I believe you have, is not cushioning and is not intended to perform a cushioning function. But how was the district court supposed to know that was a claim construction argument as opposed to a factual application of the construction it had already done? Because there was no dispute about the actual spray arm itself, the blue piece. And I invite you to take a look at the blue piece. We submitted it. It's Appendix 8266, Exhibit 71. There was no dispute about that material. Bellinger's expert said it was like a kayak, and the judge understood that was a hard plastic. So on summary judgment, that wasn't the issue about how the arm actually was constructed. The issue was, on summary judgment, what does cushioning sleeve mean? It seems to me that even if you preserve the construction you're pressing here on appeal, even if that's so, you need to put on a case of that. They had an expert. You did cross-examine the expert, but I'm not sure you got a lot out of it to support your position. And your expert was a no-show. So the jury had the stuff in front of them. They had an expert from the other side describing it. And on a JMAL with a jury verdict, it's kind of difficult for us under the correct standard to overturn that, right? The problem, Your Honor, is the construction that was given by Bellinger's expert at trial was just anything that encloses or protects. The expert was reading cushioning out of the claim. And so, again, the question is, what is a cushioning sleeve? Is it something that has to be soft and resilient, which, again, is the only thing that's described in the intrinsic evidence. On the intrinsic evidence, let me just state this just so it's clear. In the file history, the file history is crystal clear that a cushioning sleeve is something that is just a protective plastic sleeve, which is what Bellinger's expert was saying at trial. Bellinger's expert was reading cushioning out of the claim. And that was the problem, and that's what we were telling the court during Markman. It's soft and resilient. Well, then why didn't your initial claim construction in your Markman brief say that, as Judge Stark pointed out? You said a thick sleeve of extruded foam plastic that acts as a protective cushion to prevent damage. You didn't use the word soft or resilient. Well, so, again, Your Honor, at the Markman, if you look at our briefing, it was actually in several spots in our briefing at Appendix 2117, 2118. We said three different times it's something that has to soften or lessen the impact. It has to be soft or resilient structures, which, again, is how the summary of the invention described cushioning sleeve. But am I incorrect that what you proposed as the construction was what I read a minute ago? The precise wording of the construction, I believe, is consistent with that. It was a thick sleeve of extruded foam plastic that acts as a protective cushion. In the construction, we were saying it has to be a protective cushion. And then the briefing was very clear, soft or resilient. And Bellinger doesn't dispute that resilient means something that can be compressed. You keep saying it's very clear. Soft is bold and italicized, or resilient, not even highlighted. So if I was the district court, I wouldn't understand that this dispute was about resilient. But could I ask about damages? Sure. You're asking us. Well, first, are you asking us to do remediator of the supposed convoy sales portion of the damages? Is that what you're asking for, is your relief on the damages issue? Relief with respect to convoy sales, correct. Meaning you want us to do the subtraction, the $2.6 million or so. Correct. Where did you ask the district court to do that? We asked to do that during the... So where we asked the court to do that, Your Honor, was in the Daubert. You can't have a remediator request for a jury damages award in a Daubert motion that's filed before trial. Well, what we said during Daubert was the expert should be excluded because the expert did not provide any testimony about the functional relationship between the dryers and the car wash system. Got it. You didn't want him to be able to testify to convoy sales. You lost on that. So he does testify to some extent. At least he puts the number in his damages award. And then you request in a post-trial motion that, I guess, as I understand it, when you renew your Daubert, you say he never should have been able to testify. But the relief you want, at least they were asking us for, is to subtract the amount that you think was applicable or a result of the convoy sales. And I'm just asking, where did you ask the district court for that relief, the subtraction? At appendix 7556. 7556. And Washworld said, quote, the court must either reduce Bellinger's damages by $14,000, $164 per unit, or order a new trial. This is in your post-trial motion, right? That's correct. Wait a minute, 7556 and this is marked. I thought that was 7556. 7556, correct. And the court in the post-trial motion at appendix 44, the court said at appendix 44, the court rejected the argument that Bellinger's expert included non-patented components, such as the dryers and additional components, and over-inflated the lost profits by $14,164 per unit. So the court must either reduce Bellinger's damages by $14,164 per unit, or order a new trial on damages. Is that the request you're renewing in front of us? It could be either or? Well, the request is to just take the amount of the lost profits from the dryers and the additional features and just lop them off. Right, but do you want an alternative for us to think about a new trial on damages? I don't think there's one needed, because it was clear what the jury found in terms of the number. If we're not persuaded to do remittiture, should we consider a new trial on damages or should we just defer? Yes, if you're not going to remit, then a new trial. Well, what do you envision a new trial would be? I mean, I guess I'm sympathetic to the word remittiture here, because the new trial, would that, in your view, just exclude all of the expert testimony about convoyed sales, so you would just have a new trial, a repeat of the old trial on the same infringing matters? I think we would have a new trial, a completely new trial on lost profits in general. With the possibility that the jury comes back with a number bigger than the $10 million? Possibly, but again, I don't think the evidence supports that. And again, we think the remittiture is the way to go. Well, I didn't see, on questions of preservation, I didn't see, I think you preserved your remittiture argument in the blue brief, but I didn't see really any request for a new trial, other than some footnote that said, we don't need a new trial. I think that's right. That's our position. So is that, in your view, did you preserve the request for a new trial? I believe so, Your Honor, by, again, by our Daubert motion and what we filed post-trial. There's a couple of Seventh Circuit cases cited in the red brief, which I take to mean, or at least this is how Bellinger wants us to read them, that there is a possibility that that $9.8 million figure was not affected by convoy sales at all. The question, I know you don't believe that's possible, but just for the purpose of the question, assume it's possible that the jury got to $9.8 without any dollars for convoy sales. Would we then have to affirm, consistent with this Kessinger and Cosman decision that's cited in the red brief? I didn't see any response to that in the gray brief. Your Honor, what's the… Kessinger and Cosman were cited in the red brief, again, for this point, that basically if the jury verdict could be sustained on any basis, even though one basis might be an improper one, we're supposed to affirm. Because you don't have any special interrogatories, you don't have any breakdown in the verdict sheet. Your Honor, I don't think so because, again, the problem is at trial, Bellinger's expert was able to talk about lost profits and provide opinion testimony with respect to that. So I think that the damage was done at trial by the district court allowing that testimony in. Counsel, we're almost through all of your time, so why don't we hear from the other side and we'll give you two minutes for rebuttal. Okay, thank you, Your Honor. Mr. Dillon. Good morning, Your Honor. May it please the Court. Christopher Dillon for Bellinger, Inc. Mr. Dillon, the Court has obviously been interested in damages. Why wasn't the Court incorrect? A number of years ago, we decided a right height, which held that convoy damages must have, goods must have had a functional relationship to what's claimed. And here, the Court only said they were sold together. So why doesn't it either have to go back or be subject to a remediator? Your Honor, right height talked about three aspects of being able to get convoy sales. It said that it must be either a single assembly, excuse me, considered a single assembly or parts of a complete machine, or they together constitute a functional unit. Our position was that what they called convoy sales were features of one machine or assembly. This is a car wash system. One of the components they complain about is the rocker washer, the thing that washes the rocker panels or the wheels. In our view, that's part of the car wash. The decals are put onto the car wash. The heater is to heat the water used in the car wash. The pump systems are for it. Are they in the claims? No, but they are part of the same assembly or the same machine. All your experts said about that was they're often sold together, and, in fact, differentiated. Sometimes this is sold with this. Sometimes this is sold with the higher. And he didn't make, show me if I'm wrong, but I don't see where he said they all look the same in what you're telling us this morning. So as part of the supplemental request for the record, the court requested the entire expert report, and that was put in. If I could turn your attention to paragraph 39 and 40. I'm happy for you to do that, but, by the way, the expert report wasn't in front of the jury, was it? No, no, no. I will talk about the experts separately at trial testimony, but the question was what was the, they had pointed to sold with at the Daubert stage, and they pointed to a later paragraph. In our view, with in that sense was ambiguous as to whether it's sold alongside or it's sold with as it's part of. But this ambiguity is cleared up earlier in the expert report. When in paragraph 39, where the expert says when, and this is the last sentence, when including additional equipment that is sold on most packages. And that's the key. These are components of the car wash. This isn't like a vacuum cleaner or some other piece of equipment that's sold with the car wash system. These are optional features of the car wash system. And, Your Honor, you asked where at trial. If I could turn you to exhibit. Well, can I turn you to page 70? I think this may be the Daubert report of the expert. So are you talking about something different? Because at 70, he says this value includes the amount of profit that they earn, base car wash, incorporating the patent license system, as well as additional components that are sold with the average car wash system, such as decals, pumps. Yes. But Molly says they're sold with it. But they're sold with in the same sense as your car is sold with certain standard equipment and certain optional features. These are the optional features that are sold on a car wash system. They're integrated parts of a car wash system. They're not something that's sold alongside for business convenience. These are optional features, such as, for example, the rocker washers. As you drive in, those wash the wheels of the car. They're add-ons. They're discretionary add-ons. And how do they satisfy the right height test? Because they're part of the same assembly. When someone gets their car washed, they drive into the wash bay. The rocker washers wash the wheel. The spray arms wash around the sides. The dryers return the car to the state that the car was in at the beginning. They're all controlled by the same control system. It's all part of the same assembly. In many ways, this is a lot like the paper package. Did your expert ever say they're all part of the same assembly? Yes, our expert and the head of the business line said, this is the unit. And there's several pieces of the testimony I think are useful to look on at this point at trial. But first of all, I'd like to start with the brochure, because the brochure indicates that these are optional features. Doesn't optional features hurt you rather than help you? Because if they're optional, that means the system that you're purchasing can function without them. But, you know, you might want something a little fancier or whatever, or a little add-on to do something other than the basic function of the machine. Isn't that a problem for you? It is not, Your Honor, because the question in this scenario is, in this case, an infringing sale of a car wash system was made. If that infringing sale had not occurred, what would Bellinger have sold instead? And we looked at the average car wash system that Bellinger would have sold. The average car wash system is not the one that's stripped down. It's not the one with all of the options checked. It's the one that most customers choose. Most customers choose to have the rocker washers, to have the pumps, and to have the dryers. In fact, the dryers are standard on one of the two, and they're optional on the other one. And that option is taken by 75% of the customers. And so in that scenario, we only took credit for 75% because not all customers would buy that. What our expert and our business person provided to the jury at trial was testimony about what is the profit for the average unit that we sell. And the average unit that we sell includes these components. These are not additional items. It's like if you buy a car. Some cars come with certain features. We said if these components had independent functions outside of the patented system, then you don't get them as part of convoy sales. They don't have independent functions in the sense that these are part of our system. You just said they're not additional components. That's precisely what your expert said on paragraph 7. These are additional features. Instead, he called them additional components. Okay. Let's look at the misreading. All right. If I could turn your attention to Appendix 6576. This is the cross-examination of our expert at trial. 6576? Yes. And at line 2, the question, and so what you've done as far as this particular lost profits calculation is you've included an amount of profit for an entire car wash machine that would have been sold by Bellinger. Answer, yes, because that's what Bellinger is selling. And if I also could turn your attention to the testimony of Dave Doherty. He talked about this at Appendix Site 6303. He, again, is the business manager. So this is an independent piece of information and evidence that was before the jury beyond what our expert testified. He was asked, all right, what is, and this is at line 7 of 6303, what is Bellinger's gross profit for the sale of the Sabre? Answer, a Sabre is $57,700. Question, and what is Bellinger's gross profit for the sale of a Condor? Answer, $49,900. And when I say gross profit, there are other costs and taxes you still have to pay. Is that correct? Yeah. Those would be like the typical package that we sell, yes, for those pieces of equipment. I think that you needed evidence that the dryers and these other items have no independent function outside of the patented system. Do you acknowledge you did not prove that? I don't believe we had that requirement. I think we had to show. If we have that requirement, do you acknowledge that there's not substantial evidence to support that in front of the jury? I think the jury had evidence of the videos that showed the operation of the system where they saw that these were integrated. Did your experts say anything about whether the dryers have an independent function? Our inventor, Barry Turner, talked about how our dryers have a light system that's integrated into the light system in our Condor system. So it's an integrated part. He didn't say that lights can't function independently of the patented system, did he? He did not say that, Your Honor. Can I ask you, we're looking at this a little differently than I've been looking at it because I thought this was a Daubert issue, and the question was that the judge should have granted the motion to exclude based on Daubert. So I don't know what to do with these other pieces of evidence that you put in on convoyed sales, but I think one of the questions before us is whether or not the judge should have struck the expert. So if we confine ourselves to what the expert said about convoyed sales, I take your point about some of the other testimony, but there's part of the cross-examination of Dr. Duff, and that also included additional components in addition to the car machine, right? Answer, it did. As I testify, it includes a typical set of components that are sold with the Bellagio. Okay, why don't you list for me all the additional components that you include to come in this incremental profit? I mean, I think it's an unreasonable question. There are many components, but Bellinger provided data on those components, yada, yada. He's talking about being sold with. Your expert didn't make the case, did he, that there's some functional need for this in the system? He did not independently say, with regards to these components, they were individually functionally related. I admit that. So how is that appropriate to allow that testimony in under Daubert, for him to testify that this is the amount of damages that should accrue for lost profits? Because the right height test says that if it is a single machine, a single assembly, or functionally related. Our argument at trial was that this is a single machine or a single assembly. The profit we calculated was for an average Condor machine, an average Sabre machine that had certain features or components, certain options. Okay, can I just move you to just a procedural question about a new trial versus a remitter? You've got a lot of waiver arguments in your brief. Is it your argument, let's start with remitter. I think they preserved it. Let's start with hypothetically. I think they preserved it all along, including in that Wu brief. Do you take issue with that? I do. What you recorded was the reply brief that they raised in the J-Mall, and although they identified the amount per unit, there is no special interrogatory that would tell us the number of units. So they never asked the court to remit $2.6 million. Arguably, they asked it to remit $14,000 per unit, but there was no evidence in the record from which the trial judge would have been able to determine the number of units. And, in fact, in their other remitted request where they asked for pre-notice sales to be remitted, the district court said, I can't do that because you didn't ask for a special interrogatory that would break out. But that's a different issue about whether they were required to do a special interrogatory. But in Wu brief, I think I'm seeing it in Wu brief, page 37, page 69, page 70. They're challenging the refusal to reduce damages awards with respect to convoyed sales. Is that not a preservation? No, I believe it's in their Wu brief, Your Honor. Oh, so you do think they did? I don't believe it was fairly presented to the district court on J-Mall. Actually, there was no J-Mall at the district on damages. I don't believe it was presented as a remitted or argument to the district court. Because they never say $2.6 million, and they only even say reduce damages by the $14,000 per unit in the reply brief, not in the opening brief, to the district court. And the $14,000 number was never before the jury either. So the jury never made a finding as to both the number of units, and there was never a finding with regards to the total amount. They didn't make a finding, but Dr. McDuff did opine to the $14,000, didn't he? Only in his expert report, he did not testify about that in front of the jury. Well, they say in their J-Mall, not only is there no evidence in the record before the jury, but there's also no evidence in Dr. McDuff's report to support such inflated numbers. Raised in Washwood's job at motion, they refer back to their job at motion about the inadequacy of his statement. So why isn't that sufficient? Again, there was no evidence at trial as to the amount of sales to be deducted from the verdict, and the jury was not asked to determine either an amount that should be deducted for convoyed sales or the number of units. And from our perspective, our entire presentation of evidence was based on the entire machine. The profit, and there were three different numbers given. There was the $53,000 number given by our expert, and then there were separate numbers given by Dave Doherty, where he provided the profit number for our total condor. Wasn't that $14,000 number associated with those additional sales all over the place, including explicitly in a chart at 3433? It was all over the place, was it not? It was your number. The other side didn't come up with that number, right? It was the number in our expert report, but that number was never used at trial. Didn't you admit to the district court that the jury accepted Dr. McDuff's damages calculation at 7030, 7455? That is, you defended expressly the $9.8 million overall reward as basically being that the jury accepted the calculations of your expert, which would therefore include the convoyed sales. May I have that page number again, please? Yes. Trial 7030. 7030. You are writing, I think in opposition to their post-trial motion, the jury accepted his damages calculation. I'm sorry, 7030. 7030, I believe. Towards the very end of the first paragraph, the carryover paragraph at the top. Right. The jury accepted his damages calculation, awarding damages within a stated range. He had a range, and this was within the range. I don't know how they got it. But the 9.8 was only the bottom point of the range because it had a $2.6 million convoyed sales embedded in it. So the point is, how can you argue to us, we don't know if the jury awarded $2.6 million of convoyed sales when you told the district court. The jury, we know it, accepted his calculation. Well, I think we meant they accepted within the range of what he had provided, and therefore there was a basis for it. But there are other ways you could get to it, which is there were three profit numbers, two provided by Dave Doherty and one provided by our expert. There was a dispute as to units, and they did raise concerns about whether the dryer should be included. Well, the main thing was this chart, and as the district court assumed, even said, it wasn't excessive because the jury picked this line on the chart. And that line was 9.8 million, and that line is exactly what they, it was your chart, that's exactly what the jury awarded, and that 9.8 million consisted of, included, under everything your expert said, 14,164 in ancillary profits from these additional components. That's, I mean, you know, nobody knows 1,000 percent, but I don't understand. They picked 9.8, and the judge read, understood that to be the obvious, which is they picked that line, and that line includes the convoyed sales for which they are asking remitter, remitter at this point. Your Honor, I mean, I agree. We argued it that way. I expect that's the way, but as we pointed out in the Seventh Circuit, the standard review is, is there an alternative way you could get there? And there is, because both the number of units and the amount of profit were issues at trial. And this could fall within the range other ways. I expect that the jury accepted our argument on that, but because the jury was never asked to make findings as to the number of units or to the amount of convoyed sales or to the amount of profit, there's no way to know. And that's why I, although I believe that's how the jury came to it, I'm not compelled to do that. And the standard in the Seventh Circuit, if there's an alternative way that you can support the verdict, then you have to do that. I think I interrupted Judge Post earlier. New trial on damages, do you contend that they preserved or do you acknowledge that they preserved that request and are asking for it here? They did not ask for a new trial in their briefs. Here or below or both? They asked for a new trial at J-Mall, yes. They did not ask for it in their briefs here. Okay. One quick last thing. On infringement, you cite in your brief to certain discovery responses as being supportive of an infringement finding. Were those discovery responses in front of the jury? They were admitted as evidence to the jury. But they are exhibits. They're exhibits. They're trial exhibits that the jury was collecting. And your expert talked about them? Did, yes. Okay. Thank you. Thank you, counsel. Your time has obviously expired. Mr. Gannon, we will give you your full three minutes for rebuttal if needed. Thank you, Your Honor. Just to follow up on a question Judge Stark about the discovery, that I believe has to do with the term predefined wash area. The predefined wash area, just real quickly, the problem there was the fellinger argued that to the jury that the wash area is everything. It includes all the equipment. And if you include all the equipment, of course, that's predefined. That's not correct because the intrinsic evidence is clear. The wash area is a subset of the wash bay. And when you look at the right construction of wash area, and you see it's defined by where the washing is going on by the arms, that is not predefined in the accused system because the wash area changes with every vehicle. With respect to the cushioning sleeve, Judge Stark, to your point about did the judge know what we were arguing about soft and resilient, I'd like to point you to Appendix 0014 where in the opinion, the Markman opinion, the court very clearly understood that we were arguing cushioning sleeve requires soft or resilient material for the cushioning sleeve. So clearly the court was on notice of that. With respect to waiver, with respect to the Ventura case, I just wanted to point out what the stated construction was. It was, quote, a single particulate made up of a particle of active material to which one or more particles of additive material are fixed, and then it continues. That was the stated construction in that case. And the construction that was brought on appeal was they deleted all that language and they added high-energy milling process. And the Federal Circuit in that case said, you know what, the wording's different but it doesn't matter. Everybody was on notice. Everybody understood that high-energy milling was the thing that was being argued in the Markman, and so there was no waiver. And that's exactly what we have here with cushioning sleeve. Everybody knew. Does it have to be soft or resilient, either one, or can it cover something that is a hard plastic? That was the dispute. That was the dispute at Markman that the district court just didn't resolve. With respect to damages, I think it's pretty clear. Mr. Dillon cited all sorts of different testimony, some that's not in the briefs from other witnesses. There is not a single bit of testimony from anyone talking about the functional relationship of the dryers versus the car wash.  It's not even in his expert report. It's not in his expert report, which is why we moved for Daubert, and it's why that should have been excluded. You couldn't ask for the remediator, the $14,000 per unit, until your reply brief on the post-trial motion. That's too late, correct? So let me just, to that point, that was going to be my last point, Your Honor. I'm going to point you to Appendix 7222, which is our post-trial... Do you agree that a reply would be too late if I don't find it in your opening brief? It's actually, let me just be very clear. At Appendix 7222, it's laid out, chapter and verse, in the motion, not the reply, motion for a new trial, the $2.6 million, and then there's a footnote explaining where the $2.6 million came from. And then all you ask for at the end of that is that the, quote, court must overturn the jury's damages award at 7225. I understand the argument, but if I don't see the specific request for a remediator until the reply brief, do you agree that would be too late? Yes. Okay. Thank you to both counsel. The case is submitted.